All right. Be seated, please. All right. The next case we're going to hear is United States v. Holley and Ms. Parker. Excuse me, Mrs. May Parker. I've known you long enough, but it's... Good morning. May it please the Court, my name is Jennifer May Parker and I represent the United States, the appellant in this case. When conducting a reasonable suspicion analysis, a district court is charged with the duty to consider the totality of the evidence, as well as all of the reasonable inferences that are made by the police based on its knowledge at the time, as well as its training and experience. This is not what happened here. Here, the district court discounted key pieces of evidence and came to the incorrect conclusion that the officer did not have reasonable suspicion on the day that he stopped the defendant. First... Can I ask you just as a ground rule? Yes. We're looking at a Terry stop, right? Yes. And we're looking at it from the time of, it's a nice name, Bolo, from the be on the lookout announcement, up until Mr. Holley was put under control under the police. Yes. Is that the time period we're looking at? Yes. And what Mr. McCarthy knew during that time period, acted on. Right. What he knew, first of all, was he had a tip from a reliable informant, that is a confidential informant. He received the Bolo from... He didn't receive it from the informant, did he? He received it from the chief of police in Edenton. That's more reliable. Correct. You don't need to go back. That's what I was trying to find out, what was known to Mr. McCarthy. He receives a police Bolo that says, we're looking out for a white Cadillac, Mr. Holley is driving it, Skylar, not driving it, was in it. In it, correct. And he had used a gun at the crown mart. Yes. And, okay. And this officer who received the Bolo had also, hadn't he seen a photo of Mr. Holley? Yes. Because there was an outstanding warrant? Correct. He had seen a photograph, not a photograph, but a picture on a warrant for the defendant, Mr. Holley, because a few days recently before the stop. Mr. McCarthy knew Mr. Holley to be an African American. Yes, he did. He had known him from prior experience. Correct. It's a small town. Correct. In addition to that... And then he relates that Bolo to a time and a place. Correct. Where he sees a white Cadillac. Yes. He relates it by distance, knowing how far it takes from the crown mart, the fact that the car is going away from the mart, and at a time, roughly, that accommodates that distance. Correct. I'm sorry, what do we mean by going away from the mart? Did he factor in the direction in which the car was going when he left the mart? Well, yes, I believe that he did. It's a reasonable inference that he did, because he was heading towards... That's not in the record, that he took into account the direction of the car, is it? Well, let me read you exactly what he said. He said, when he saw the car, that he, based on my training and experience, I believe this Cadillac was probably the suspect vehicle. In the time that it took the assault by pointing a gun, the CI to call the chief, the chief to relay the information over the radio, there was sufficient time for the suspect Cadillac to make its way across town in the general area where I was. This is a minor point, but he's saying, basically, the amount of time was consistent with the amount of distance, but not that... He doesn't say, like, I heard that the car took off going south, and I am standing south, and that's how I know it's the same car. Correct. He did not say in the Bolo there was no direction in it. But what is a reasonable inference from what he's saying is that the car was heading towards him, and he was heading towards Edenton. And he did say in Herring that he lived in Edenton and knew where things were. So, yes, in answer to your question, there was no specific information about direction, but I think it's implicit. It's implicit that both distance and direction would flow from what he was calculating at the time that he saw this specific Cadillac. So we get to the point, then, based on your summary of the evidence so far, where the officer gets behind his Cadillac and he activates his blue lights. The district court did not calculate in what the officer saw and what he reasoned based on his training experience, what was going on in the Cadillac. The officer said that he saw the passenger in that car sitting and acting as if he was trying to conceal his identity. And the district court did not take that into consideration. Instead, the district court interjected that that is something that is not unusual for a person to be slumped. What's important here is to understand that what the officer was saying was based on his training and experience. It appeared as if that passenger was attempting to hide his identity. And so it was incorrect. Do we have to take that into consideration to rule in your favor? Can we also discount that and still rule in your favor? Yes. Yes. You can discount it and still rule in our favor. Yeah, but you've got to add up everything. The car didn't stop. Right. The car turned a corner. Went off the highway twice. That's right. He drove into a driveway. Right. And then he gets out before he starts and could even want to flee. They say get back in the car. Yes. When they told him to get back in the car, they seized him. Yes. They told him to get back in the car. He yielded. Yes. He yielded to the show of authority at that point. But I understood Your Honor's question to really be asking me did he have reasonable suspicion before that. The question is that you have a Bolo, say in a white Cadillac with an African American driving. Yes. Or with a Holley driving. Not driving. In the car. In the car. In the car. You have the officer knowing that it's a white Cadillac with an African American. That appears at a time and a place consistent with the Bolo. Yes. How many Cadillacs and so forth. That doesn't stop for the light. He sees the passenger slouch. The car then evades. Not just doesn't stop. Evades. Turns right. Goes, pulls off the highway. Pulls back on. Pulls off the highway. Pulls back on. Then turns into a driveway. And the guy immediately, passenger immediately gets out. Now that is the question is whether that sequence of events creates enough suspicion to have the officer have a temporary stop and allay that suspicion. Our position is absolutely it does. There is more than sufficient reasonable suspicion here for this stop. It was legal. It's well within the Fourth Amendment. None of the defendant's rights were violated in this case. Counsel, can I ask you a question? I agree with you. Assuming for a minute that the district court erred when the district court held that anything after the siren goes on isn't part of the picture. What do we have to judge sort of how suspicious that activity in the car really was? Because the defendant is arguing everything you've described, it could also be consistent with someone looking for a place to pull over. They move very slowly. The police report says it's not like they took off. This is not flight or anything like that. They're moving very slowly down the street. They pull off. They get back on. They find a place to pull off. That's the defendant's story. The district court never considered any of this kind of factual dispute. Don't we have to send this back and let the district court figure out what really happened here and how suspicious it was? And that was our purpose for filing a motion for reconsideration really was to appeal to the district court to take a fresh look at it and to include that information that it had discounted initially. But our position here is right now there is sufficient in the evidence based on this court's precedent, the Supreme Court's precedent, to find that there was reasonable suspicion. Now, if the court chooses to send it back so the district court can take a look at it again, I think the district court made the comment, if I'm wrong, the Fourth Circuit will tell me so. So we're really here for and really asking you to tell the district court that it was wrong because that major part of the evidence was excluded and it did so incorrectly. He didn't exclude it. He just didn't consider it. He discounted it. Yeah. He excluded the post-siren part. He said that is not part of the equation. You need reasonable suspicion at the moment you turn on that siren. Yes. That's the way I read the district court. Okay. And you think that is just a legal error that we should reverse? Correct. And not only reverse but to find that the district court made an error and that there was, in fact, reasonable suspicion in this particular stop. In light of what happened after the siren went on? In light of all of it. But until the siren goes on, I mean, there are cases, right, saying that although review is de novo, we're really supposed to defer to the district court judge's better understanding of local conditions. Things like, I'm telling you, there's lots of white Cadillacs around. So under cases like Cornelius, are we really supposed to sit here and say, no, the district court was wrong, there are very few white Cadillacs? Yeah, unless it's clearly erroneous, and I think in this case . . . Is there something we're supposed to look at about the number of registered Cadillacs in this? Well, first of all, that was not a fact that the officer considered. The officer did not just pick arbitrary . . . Well, he didn't just pick an arbitrary Cadillac. No, but we're talking about, and you don't have to be defensive about it, this is a white Cadillac with an African-American in it in a town of 5,000 at a time and a place that is consistent with the Bolo. Correct. And what do we have, three or four or five Cadillacs in that area? I mean, I'll bet you the chances of that occurring are one in a million at that time and place. I don't care how many are registered in this little town. Quite apart from that, then you have the guy who doesn't stop. The guy turns a corner. Now you can consider it evasive. Instead of pulling off on the highway, he turns a corner and makes a right turn or left turn, right turn off of Atlantic. Where did he make a right turn? I think he made a left turn, but I don't know. The car was going north. I think he went east then, didn't he? Yes. And then he tried, the light's still going, the siren's now on, and he pulls off and he pulls back on the highway. Now, if there's no, you asked the question, the officer is just acting like any professional officer, something's going on. And we have a dangerous warning here. If he'd let the guy go, he says, oh, I don't have reasonable suspicion. And the guy goes up and holds a 7-11 and shoots him. What would the public say about his not stopping him? I think they would find that he was derelict in his duties. And I'm agreeing with you that it was that white Cadillac at that place at that time. What I was attempting to say, it wasn't just any of the other white Cadillacs that are in Edenton. Oh, if it's three days later and you see one driving around town, that must have been him. Correct. That's a problem. Exactly. Exactly. So I'm fully agreeing with you that. In other words, if you take the totality, isn't that what we're supposed to look at? That's right. The totality of all of it. Does it raise a reasonable suspicion that crime may be afoot? Yes. And they can allay the suspicion with a short stop. Yes. That's what Terry says. And, in fact, here, the crime had already occurred. And that's also something the officer had knowledge of. All right.  Wait, I just had one last quick question. Oh, I'm sorry. Are you arguing or did you at any point argue that the failure to sort of stop or pull over immediately when the siren went on, that that by itself would be grounds for the stop? I mean, isn't that illegal not to pull over when a police officer turns on a siren? It is illegal not to stop when the officer shows authority. But I'm not arguing that that by itself is what we have here. I'm arguing that all of it. No, it's not what we have here. But I'm just wondering. You never argued at any stage that that was sufficient. I didn't argue that. But it probably would have been, you think? Yes. I mean, the flight here, which would be what occurred, the flight here would be enough for the officer to do an investigative stop to see why are you fleeing. So why aren't you arguing that? I'm just curious. I thought your question was did I argue it. That was one of my questions. And then since the answer is no, my follow-up question is how come? Well, now I argue it. Okay. Because none of those, all of those arguments are consistent with the evidence and they support the reasonable suspicion here. No further questions? I thank you and I ask you to vacate the judgment of the district court. All right. Mr. Brignac. Thank you, Judge Niemeyer. Eric Brignac for Schuyler Holly. As in most appeals, the only way the appellant, in this case the government, can get Judge Britt reversed is to show that he committed legal error or that on this evidence in the light viewed most favorable to Mr. Holly, he clearly erred. And the government can show neither of those things. What if we conclude that taking the totality of the circumstances, there's just simply no question that a reasonable officer would have suspicion sufficient to make a stop? We're not talking about probable cause or some higher level. We're just talking about the right of an officer to allay a suspicion. And what we have to determine is whether the suspicion the officer articulated based on the facts were sufficient. Yes, sir. And in this case, the district court basically considered two facts and actually changed them. One is the white Cadillac driven by an African American. And he sort of said, well, there are a lot of Cadillacs around, but African Americans, and basically said that's not enough. But that hardly takes into account the fact that this Cadillac was at a time and place consistent with the Bolo, that the officer observed conduct in the vehicle, that the officer observed the vehicle itself's conduct, the officer tried to stop it, put on its siren, and then the passenger jumps out and the officer has to order him back in to keep control of him at that point. It seems to me you take all this into account, and it's almost I can't figure out what these people would be about except be suspicious. Thank you. To answer Your Honor's first question, if this panel were to hold that the district court erred, then yes, this panel would reverse, and this entire appeal is demonstrating that the record does not support that. To take it in some order, first, I know there's been questions, Judge Harris, about when exactly the seizure occurred. And I did a fair amount of research on this, and I know the government I'm sure did as well. Cases are clear that if there's headlong flight in the face of authority, that is not a seizure. The cases are clear that once there is a submission, once someone is physically detained, that is a seizure. At this point, what I could not find is a case saying what happens in the process of being seized. The blue lights come on. You drive 210. We have lots of cases, people fleeing, people not submitting, people resisting. Hodari lays it. Yes, and Your Honor. It seems to me, are you taking issue with the fact that the search commenced, the seizure occurred before he was put under control or submitted? Your Honor, I do not want to derail it on this point because I think we must look at the totality of the circumstances which are the lack of suspicion. But, yes, Your Honor. When was he seized? Your Honor, Judge Britt found out. I want to know your point when he was seized. The blue lights came on. At that point, the car. He was seized? Our cases are replete with that. At that point, if the car had, Your Honor, sped up, if the car had begun driving evasively. It doesn't matter if the car didn't stop, if the car went 10 miles an hour and didn't stop. He's not seized. He can step on the gas immediately. The officers didn't have him in control. What about if the car pulled off the road as if it was going to stop and then took off again? Isn't that evasive and fleeing? Well, Your Honor, the question and, Your Honor, that factual scenario where a car, I would say, took off, certainly that record would be much different than this and we could find the district judge clearly aired. Yes, Your Honor. The Fourth Amendment talks about a seizure. And the Supreme Court has defined a seizure to occur when they achieve control over the person or when he submits to control. Now, tell me how the police had control of a person who has not yet been put under control. An officer says with his gun aimed at a guy, he says, Stop, stop. The guy goes like this and then starts running. It's not a seizure, and that's actually cases that we've had. And axiomatically, Your Honor, if someone is not under control, then they are not under control, they are not seized. I would say the question in this case is whether on this record, driving two-tenths of a mile, slowing down, attempting to pull over twice and then pulling into a driveway,  No, no. I want you to tell me your argument as to when Mr. Hawley was seized in this case under the Constitution, under the Supreme Court's precedent of having control. And, Your Honor, and you disagree with me on this. No, no. I want you to tell me your position when he was seized. When the blue lights came on and the car began a process of pulling over and at no point acted evasively, he was seized. We obviously disagree, but I believe because there was no evasive maneuvers, it began, though, as I said, I looked for a case involving these specific facts. I could not find one, but I respectfully disagree. Yes, Your Honor. No, but you could frame your argument that way, right, that there was, that the seizure occurred as soon as the blue light went on and Mr. Hawley began this rather arduous process of pulling over. But you could also frame it, right, as saying, okay, the seizure occurs when the car pulls over, but nothing that happened in the course of that two-tenths of a mile was terribly suspicious because it's consistent with someone trying to pull over. Those are two slightly different arguments. Those are two, actually, thank you, Judge Harris, and more to the point, it was not clearly erroneous for Judge Britt to find that on this record, that that, as he put, that's no suspicion at all, and I may be slightly misquoting him. But, and also to step back, I believe, you know, Your Honors have mentioned several times that the time and the place of the seizure was sort of consistent with the bolo. That does make it seem like, again, that the direction of travel was in any way before the district court. It was not. The direction of travel, the road the car was on, whether it made sense for the car... The time and distance was. And, again, looking at this record in the light most favorable to Mr. Holley and whether Judge Britt clearly erred, the record actually shows all we know is that it was a large distance and a significant amount of time. The officer's report says... The officer's report never says how close... He says it was across town. The officer's report, and that's Joint Appendix 17 to 20, and, again, there's not much, he says, in the time it took for the assault to take place, the CI to call the chief, the chief to relay the information over the radio, there was sufficient time for the suspect Cadillac to make it across town in the general area I was. Those are the facts. And, you know, nothing in there about the highway it was on. I knew it was on Highway 1, and that would be the sense, the direction it was traveling. This occurred two blocks away. I knew it would take 30 seconds for the Bolo to come out, and I saw the car two blocks from the Crown Mart. In fact, when you read this, and, again, certainly in the light most favorable to Mr. Holley, multiple events took place a fair amount of time, sufficient time, and far away. And one of the things about reasonable suspicion that the Supreme Court has said is an officer's reasonable suspicion cannot cast a net too widely. It cannot capture the majority of citizens' behavior. And saying that something that happened a long time ago and across town means that, as a mathematical possibility, this car could have made it here, this vehicle could have made it here, no idea it was a car. Could have been a Cadillac Escalade, could have been an old Cadillac, new Cadillac. But just saying, well, I was far away, and it was a long time ago, so it was theoretically possible for this to be the car, that's the hunch. That's not reasonable, that's not our... We're talking about a town of 5,000. We're talking about a crown mark a mile and a half away from where he cited him. We're talking about a few minutes that the officer calculated. We're talking about somebody that knows the whole geography of the area, that the car wasn't going to the crown mark. The crown mark was on the south end of town. The car was going north. And the officer made a U-turn. The officer was headed to the crown mark and made a U-turn to follow this Cadillac. So this is not a hypothetical where somebody's been roaming around for a while, and it could mix up with a lot of Cadillacs in the area. And I apologize, Your Honor, I do not recall from the record where it said it was a mile and a half. And I do recall where the officer said he was going into town, but again, I don't recall that he was headed towards the crown mark, and I apologize. If that is in the record, then I missed it. But that's kind of the point. There's so many little assumptions the government is asking this court to make that aren't in the record. Certainly, had Deputy MacArthur gotten up, we would have a different record, and we don't know what it would have shown. We don't know Chief Fortenberry. We don't know how many white Cadillacs were in the town of Edenton. I'm talking about at a time and a place the officer estimated, in his experience, was consistent with the BOLO. And based on what, Your Honor, is our question? He knows where the crown mark was. This is a small town, and he knows where the crown mark... He was at the McDonald's, right? And you can look it up. It's 1.4 tenths of a mile, whatever it is. But he was in front of the McDonald's, and the BOLO's saying a guy had used a gun here, and a white Cadillac, an African-American. No, actually, he recognized the name of the person, used the name. And the officer, McCarthy, sees the white Cadillac within a few minutes of that, headed in the opposite direction the officer was going. And, you know, again, Your Honor, if we're talking about the location of the McDonald's relative to the location of the crown mark, none of that is in this record. The question isn't... That's on a map. Do I have to put that in the record? Or can I take judicial notice of a map? Your Honor, putting a map on the record at the appellate level, putting a fact on the record at the appellate level, when that is the exact sort of thing that could have come out at the hearing, and I don't want this to get lost. We mentioned it in our brief several times. The officer's testimony would have been subjected to cross-examination. There wouldn't... It's so easy to... You're saying we couldn't take judicial notice of a map. I'm saying, Your Honor, that in this police report... Am I saying you can't...? I'm sorry. I actually am not as familiar with the law of judicial notice, so I don't know the answer. I would say that in this context, when if this court were to find that the map were a determinate fact in the proceeding, then the answer would be, well, that wasn't the evidence. The party with the burden of proof did not put that in front of the district court, and you lose. This isn't a case... We're not supposed to look at determinative aspects. We're supposed to look at the totality and say, would a reasonable officer in that position be able to conclude that there was suspicion here and the suspicion was reasonable? In other words, this is not something where we say, is somebody slouching enough? Is the fact that Cadillac is there enough? Is the fact that a person was pulled didn't stop or that went off the highway? The answer is, we've indicated several times we don't look at those in parson. What we do is, the total information that Officer McCarthy had, we take into account and ask the question, would a reasonable officer in that position be entitled to conclude there was a reasonable suspicion? Yes, and that is black-letter law and Judge Britt correctly found that the officer did not have reasonable suspicion. The officer had a hunch. Can I ask you just another question, sort of a factual question about the hearing below? Was there any testimony taken or was there any discussion about what happened after the siren went on? Did the district court consider that at all? The district court did, after the district court issued its oral ruling from the bench, it said two things. First, it clarified that it did, even though it did not recite every single piece of evidence in the record, it did consider it all, and as this court's aware, district courts are under no obligation. It also, the government, after the court announced its ruling, asked the court to expressly consider, I believe that Skylar Holly was slouching, and there the district court found that, based on that evidence, that he did not find that that was... But the arguably evasive driving, the two tenths of a mile, that's what I'm trying to figure out, if that was looked at below or not. Yes, because that was in the police report, and Judge Britt said, Judge Britt said he considered everything, so I believe Judge Britt considered it, and again, it was arguably evasive. I think you could look at that, and a fact finder, having looked at it, could certainly say that seems evasive. The fact finder in this case looked at it and said it did not seem evasive, but it was in the record. I do not, Your Honor, believe that it was discussed much, if at all, orally, by the parties. You think the fact finder has already looked at it, so there's no need for a remand to send it back? When Judge Britt says, I've considered the entire record, and in this case, I mean, the government's evidence was a two-page police report, so I think we can say that the judge read the entire police report, and I do not see a need, certainly, Your Honors, for a remand. All the evidence was in front of the district court, and the district court made his finding, and that finding, that someone drives two-tenths of a mile, tries to pull over, finds a safer place to pull over, it's not clearly erroneous to say that's not evasive. You conclude it's a safer place? He's going north on Atlantic Avenue. He turns off onto a side street, goes off on the shoulder, comes back onto the highway, goes off on the shoulder, all the meantime, the blue light's going, the siren's going, comes back on the highway, goes down the highway, and turns left into a driveway. Yes, and Judge Britt found, I mean, Your Honor, I can certainly, and I wasn't there, and we weren't there, and... Well, those are the facts of the record. And you tell me an officer, a reasonable officer, could not conclude that's evasive? What I would have, if a reasonable officer could certainly, Your Honor, have the opinion that that was evasive. But his opinion is not entitled, it is not a fact. And what I would have appreciated, and I think we all would have appreciated, is to have Officer Holly on the stand, I'm sorry, Officer MacArthur on the stand, Chief Fortenberry on the stand, and say, okay, what was the area like? He pulled over on the shoulder. Well, you know, it was a very busy road, it was a very narrow shoulder. Or, maybe he would have said, actually... It was on Atlantic Avenue, that's where the light went on. I'll trust Your Honor on that. The point is, Your Honor, the government witness is up there, suddenly the question of, well, you thought it was evasive, but wasn't where he tried to pull over a dangerous area? Well, sort of. Wasn't the driveway a safe, wasn't that the first place he could really pull off the road entirely? We don't know what he would have said, but that's why we really want the party with the burden of production to put witnesses on at a hearing. Because all of this factual record could be developed. The factual record wasn't developed, and so here we are, on appeal, just trying to say on a two-page police report, did Judge Britt clearly err in making his findings a fact? And I think the answer's no. I would also, Your Honor, just point out, you know, I think Your Honor speculated about the number of white Cadillacs, you know, I think Justice... No, I didn't speculate. I'm just asking you, what's the probability of a white Cadillac with African-American in it, uh, appearing at a time and place consistent with Ebola? And I'm sure there could be another white Cadillac at that time. Yeah, I... But the, uh, we're talking about just common sense. And Your Honor, I do not know... They're looking at registrations and so forth. I, Your Honor, I do not know. I certainly know that Edenton is, if not a majority, certainly close to a majority African-American city, so, you know, seeing a black male in a car is not going to have as much suspicion as it, say, would in suburban Raleigh where I live. There's a lot of those little facts, and I think Justice Scalia in his Navarrette dissent, when he is sort of, in his way, humorously speculating about the likelihood of a... Officer A says, uh, a white Cadillac was just involved in this very serious crime here. It has an African-American in it, Mr. Hawley, uh, uh, leaving the Crown Mart. And another officer, a few minutes later, 1.4 miles away, says, I see a white Cadillac with an officer in it. He shouldn't stop that car? And Officer B also lives in that small town and so would very well know how long it should take to get from the McDonald's to that location. And again, Your Honor, I would say that's not what the record shows. The report shows far distance, significant time. Google Maps shows 1.4 miles, and we've taken judicial notice of Google Maps in Castellanos, and the Second Circuit has done it in Pauls v. Thomas, and the, uh, and the Tenth Circuit has done it, no, Tenth Circuit did it in Pauls, and the Second Circuit did it in Briscoe. I don't think there's a question we can look at the maps. And the record does show at JA39 that the officer lived in Edenton. He testified to that. And so, that coupled with the police report that says, based on his experience. Yes, and, you know, did he move there a week before the hearing? Did he move there 20 years ago? Again, facts, cross-examination, things that would have been in the record that possibly could have been a scaffolding upon which to build a clearly erroneous argument. I do, Your Honors, cross-examining, or somebody from your office cross-examining. Only on the point, that was Ms. Pereira, and only on the point that was brought out by the District Court, which was to, about the mugshot. One thing I do, Your Honors, it did not, because Judge Britt did not have to really go to the reliability of the tip, this was not really part of the argument, but certainly to the extent, you know, this was a Terry stop, I would point the Court to... That doesn't affect MacArthur at all, does it? He gets the report from another police officer, and we've held many times that a report from one police officer to the other can be relied on. Oh, yes, Your Honor. I would simply point the Court to footnote 2 of Navarette, where the Supreme Court majority and the dissent agrees with this, that it is an open question as to whether a tip concerning a completed crime can lead to a Terry stop. Certainly an ongoing crime, I am carrying drugs, I am driving while intoxicated, can lead to Terry. It's not as easy to say, Skyler Hawley committed a crime at some point. That's if the officer who got the tip is making the stop. He's relying on the stop. Here, is it MacArthur, is his name? I believe it's MacArthur. Okay, Officer MacArthur, he received a bolo from another police officer. Yes, and I'm... Yes, of course, he's not going behind and asking, how good's your tip? No, and Your Honor, my time is up. Again, I would only, to the extent the court really needs to reach that issue, I would just point out that it is a very open issue, footnote to a Navarette. And if there are no further questions, thank you very much. Thank you. Ms. May Park. Your Honors, I just have two quick points to make. I'll point you to the Joint Appendix, page 43 at the very bottom, where the District Court said, the fact that this car took off and didn't stop is not a part of the equation, as far as I'm concerned. So yes, the District Court did specifically disregard the evidence of the Cadillac's failure to stop when there was a show of authority by the police. Secondly, in Lender, this court held, as well as California v. Haddari, that when there is a show of authority by a police, and the defendant or the person does not submit or yield to that show of authority, that there is no seizure. So that it is clear from the case law that what happened here, when the officer put on his blue lights and sirens and that car did not yield, that there was no seizure. The seizure occurred at the moment that they yielded to the authority and stopped. So when the car pulls over, that's when the seizure occurs? Yes, when it stops. When the car stops. That's a little different from what I posed to you earlier. When the car stops, that's when the driver stops. The question is, in this case there was also the fact that Mr. Holley, who was the passenger, immediately opened the door and got out. And the officer said to get back in. That's right. To keep things under control. Now the question is, had Holley gotten out of the car and fled, we would not have argued that the seizure, the stopping of the vehicle was a seizure of the passenger. That's correct. That's correct. When he submitted to the police officer. Either he's taken out of control or he's submitted. Yes. There has to be an exercise of control. I think that's in the Supreme Court case. That's correct. When he told him to get back in the car and he submitted to that and put his hands up, that's when the seizure occurred. Okay, so not when the car pulls over when he gets back in the car. That's right. Because he was a passenger and not the driver. I think the difference here was that he was a passenger and not the driver. And as long as we're distinguishing passengers and drivers, does it make any difference then in thinking about whatever you call that two-tenths of a mile. Was it evasive driving? Was it someone trying to pull over?  driving the car. So how does that add to the suspicion of the passenger? That it takes two-tenths of a mile for the driver to pull over? As long as we're splitting them up. You look at the totality of the circumstances. It's not the suspicion of the passenger. It's the suspicion of the circumstance. As the officer is viewing this, using his training and experience and his common sense, he's looking at what are they doing? How are they responding? So it's not necessarily the suspicion as to the passenger that's in the car. The passenger, however, was trying to hide his identity. And that's why it all comes to... I'm just putting to one side the time and the place, the hiding of the identity, everything that was sort of Holly-specific. If we're just talking about the two-tenths of a mile, where it takes a long time to pull over, either because it's evasive activity or, as the defendant would have it, because he's looking for somewhere to pull over, we can attribute that to the passenger? Absolutely. And how come? I'm sure that's right, but why? Because he was in that car, and because there was no submission to the authority by him. No, I get that we can look at that time period, that there has been no submission. For purposes of argument, I'm assuming the seizure doesn't take place until when you just said it takes place, when they get Holly under control. But I'm just talking about how much suspicion you attach to the fact that it took somebody, not Holly, two-tenths of a mile to pull over. You're saying it doesn't make any difference. Holly could have been the passenger. It's all the same. Yes. One more point that I'd like to address is the contemporaneous nature of what happened here. Contemporaneous responses have always been given some degree of reliability. And this is not a crime, or it's not a confidential information that occurred a day before, an hour before, or even half an hour before. This was a reaction by the officer within a very short time of receiving that information. So that, in and of itself, is important in the officer calculating and looking at this car at that place and time. So, Your Honors, I think that we submit to you, as I did before, that there was reasonable suspicion to pull this car over, and we ask that you do so. Thank you. Thank you. All right. That concludes our hearings for today. We'll adjourn court until tomorrow morning. This honorable court stands adjourned until tomorrow morning at 9.30. God save the United States and this honorable court. We'll come down and greet counsel.
judges: Paul V. Niemeyer, Stephanie D. Thacker, Pamela A. Harris